IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-CV-274-D

PRICHARD ENTERPRISES, INC., )
)
Plaintiff, )
)
v. )                                    **ORDER**
)
BOBBY R. ADKINS, )
)
Defendant. )

On October 9, 2006, Prichard Enterprises, Inc. ("Prichard Enterprises" or "plaintiff") bought

a 1975 Cessna SkyMaster airplane from Bobby R. Adkins ("Adkins" or "defendant") for $132,500.

Prichard Enterprises is unhappy with the purchase and wants to either rescind the transaction and get

its money back or to recover damages. The main dispute between the parties centers on the meaning

of "airworthy condition" in a warranty contained in the sales contract. On May 28, 2010, Prichard

Enterprises sued Adkins in the Superior Court of Wake County, North Carolina [D.E. 1–2]. On July

2, 2010, Adkins removed the case to this court. On August 2, 2011, following discovery, Adkins

filed a motion for summary judgment and a supporting memorandum [D.E. 34–35]. Prichard

Enterprises responded in opposition [D.E. 36], and defendant replied [D.E. 38]. As explained

below, the plane was in "airworthy condition" when Adkins sold it. Thus, Adkins did not breach

the warranty, and the court grants Adkins's motion for summary judgment.

I.

Prichard Enterprises is a Nevada corporation and its sole shareholder and employee is Terry

Prichard ("Prichard"). Compl. [D.E. 2-1] ¶¶ 1, 12; Def.'s Mem. Supp. Mot. Summ. J. [D.E. 35] 2.

In 2006, Prichard became interested in purchasing an aircraft for business and recreational purposes.

Def.'s Mem. Supp. Mot. Summ. J., Ex. 1 ("Prichard Dep.") 10, 18. To minimize his personal tax liability, Prichard planned to purchase the aircraft through Prichard Enterprises. Id. 15.

Prichard focused his interest on Cessna SkyMasters, which are twin-engine, propeller aircrafts with four seats, a pressurized cabin, and retractable landing gear. Id. 18; Def.'s Mem. Supp. Mot. Summ. J., Ex. 2 ("Adkins Dep.") 13, 37–38. Prichard believed that SkyMasters had good range, and had many of the flying characteristics of single-engine aircraft. Prichard Dep. 18. In the late 1980s, Prichard became licensed to fly single-engine aircraft. See id. 16. However, he planned to purchase a SkyMaster, have a friend and twin-engine-licensed pilot, Tim Sorrells ("Sorrells"), teach him to fly the twin-engine aircraft, and then attain a twin-engine pilot's license from the Federal Aviation Administration ("FAA"). Id. 18–20. According to Prichard, Sorrells is a commercially-licensed pilot who is employed by United Parcel Service to fly 747 aircraft. Id. 28. Sorrells is not a licensed aircraft mechanic. Pl.'s Mem. Opp'n Mot. Summ. J., Ex. A ("Prichard Aff.") ¶ 5.

Adkins is a resident of Dublin, Virginia. In 2006, he owned a Cessna SkyMaster aircraft that he was looking to sell ("plane" or "aircraft"). See Adkins Dep. 30. Adkins wanted to sell the plane because it did not have de-icing capabilities on its wing and tail surfaces, hindering his routine low-altitude flights to the northeastern United States. Id. Adkins estimated that he flew the plane approximately fifty or sixty hours during the one year that he owned it. Id. 79. He used the plane for personal travel, often carrying family members as passengers. Id. 79–80. Adkins intended to and did replace the plane with an almost identical model that had increased de-icing capabilities. Id. 37–38.

In 2006, through third-party broker Bill Crews ("Crews"), Prichard contacted Adkins about purchasing the plane. Id. 49. During pre-sale conversations, Prichard arranged to have Sorrells

inspect the plane. Prichard Dep. 26–29. Prichard requested through Crews that Adkins allow Sorrells to visually inspect the plane, review the logbooks, and fly the aircraft. Id.; Prichard Aff. ¶ 4. Through Crews, Adkins agreed to these requests and the parties scheduled Sorrells's inspection for a date in October 2006. See Adkins Dep. 49.[1] On the agreed-upon date, Sorrells arrived at the Rowan County, North Carolina Airport where the aircraft was hangared, and found that the plane could not be flown that day because mechanics were performing routine maintenance on its avionics system. See Prichard Dep. 26; Prichard Aff. ¶¶ 6–7. Unable to perform a test flight, Sorrells conducted a "walk around" examination of the plane's exterior and interior and reviewed the plane's logbooks. Prichard Dep. 26–28; Prichard Aff. ¶ 8.

Prichard then contracted with the maintenance shop of the Rowan County Airport to inspect the plane. Bove Aff. ¶ 8; see Prichard Dep. 55–56. Bove, a maintenance shop employee and certified airframe and powerplant ("A&P") mechanic with an FAA Inspection Authorization ("IA"), performed the inspection on the same day as Sorrells's inspection. See Bove Aff. ¶¶ 2, 8. Bove was familiar with the plane. In fact, in May 2006, Bove had performed the FAA-required annual inspection of the aircraft pursuant to a contract between his employer and Adkins. See id. ¶¶ 4–6.[2]

_____

[1] The record does not include the specific date of Sorrells's inspection. The court concludes that the date was in early October 2006, based upon Prichard's statement that he hired an employee of the Rowan County Airport, Greg Bove ("Bove"), to inspect the plane in Sorrells's presence, see Prichard Dep. 54–55, Bove's statement that he inspected the plane for Prichard in October 2006, see Def.'s Mem. Supp. Mot. Summ. J., Ex. 3 ("Bove Aff.") ¶ 8, and the invoice from Bove's inspection having an opening date of October 3, 2006, see id., Ex. D ("October 2006 Invoice - Prichard").

[2] The FAA requires that all United States-registered aircraft carry an airworthiness certificate. See 14 C.F.R. § 21.173. An owner of a used aircraft can receive an airworthiness certificate by demonstrating to the FAA that the aircraft "has been inspected in accordance with the performance rules for 100-hour inspections . . . and found airworthy by . . . [t]he holder of a repair station certificate . . . [or] the [h]older of a mechanic certificate . . . ." Id. § 21.183(d). Standard airworthiness certificates are valid for so long as annual "maintenance, preventive maintenance, and alterations are performed . . . ." Id. § 21.181; see also id. § 91.409(a).

3

In the May 2006 inspection, Bove "complied with all airworthiness directives from the FAA" and performed the inspection pursuant to the Cessna-provided maintenance manual and checklist. Id. ¶ 5; see id., Ex. A ("May 2006 Inspection Checklist"). Thus, Bove inspected "the battery, battery box, and battery cables; propeller governor cables and controls; internal combustion heater; engines; and every other system or part in the aircraft required for an airworthiness certification." Bove Aff. ¶ 5. After the May 2006 inspection, Bove informed Adkins of thirty-five mechanical problems and proposed remedial measures for them. Id. ¶ 6; see id., Ex. B ("May 2006 Invoice"). Adkins instructed Bove to perform all of the proposed remedial measures. Bove Aff. ¶ 6. Upon completing these repairs, Bove certified the aircraft as airworthy. Id. ¶ 7; see id., Ex. C ("May 2006 Logbook Entry").

Bove's October 2006 inspection for Prichard revealed a few minor mechanical problems, which Bove reported to Prichard. Bove Aff. ¶ 8; see October 2006 Invoice - Prichard; Bove Aff., Ex. E ("October 2006 Inspection Notes"). In his report, Bove proposed remedial measures for the identified problems. See October 2006 Invoice - Prichard. At Adkins's expense, Bove then completed all but one of the proposed remedial measures. Bove Aff. ¶ 9; id., Ex. F ("October 2006 Invoice - Adkins"). Bove did not replace a worn cowling door at this time, because a "worn cowling [door] is a minor issue that in no way affects [an] aircraft's airworthiness." Bove Aff. ¶ 9. During the October 2006 inspection, Bove "saw no issues whatsoever that affected the aircraft's airworthiness . . . ." Id. ¶ 10. Bove believes that "the aircraft was airworthy when [he] completed the pre-purchase inspection and repairs." Id. Bove made such assurances to Sorrells at that time. See Prichard Dep. 27; Prichard Aff. ¶ 8. Sorrells then reported to Prichard that, although Sorrells had not been able to fly the plane as planned, he did not discover anything about the plane that caused him concern. See Prichard Dep. 28; Prichard Aff. ¶ 9.

4

Based in part on Sorrells's and Bove's inspections, Prichard decided to have Prichard Enterprises purchase the plane. See Prichard Dep. 29, 56; Prichard Aff. ¶ 10. On October 9, 2006, Adkins and Prichard Enterprises signed a contract in which Prichard Enterprises agreed to purchase the 1975 Cessna SkyMaster, Model 1337G-P from Adkins for $132,500. Def.'s Mem. Supp. Mot. Summ. J., Ex. 5 ("Purchase Agreement") ¶¶ 1–2. In the purchase agreement, Adkins expressly warranted that "the Aircraft is in airworthy condition . . . ." Id. ¶ 6. This was the only warranty or specific representation about the plane's condition that Adkins made to Prichard Enterprises. Prichard Dep. 54; see also Purchase Agreement ¶ 6.

On the sale date, Adkins, Prichard, and Sorrells met at a Charlotte, North Carolina airport. Compl. ¶ 12; Prichard Dep. 63. Adkins then flew the plane (with Prichard and Sorrells as passengers) to the Rowan County Airport. Compl. ¶ 12; Prichard Dep. 63. Prichard had not ridden in or flown the plane before this flight. Prichard Dep. 63. When Adkins and Prichard landed at the Rowan County Airport, they finalized the contract, and Adkins departed on a different plane. See Compl. ¶ 12; Prichard Dep. 63.

The following day, Crews met Prichard and Sorrells at the Rowan County Airport to give them "kind of an orientation ride . . . ." Prichard Dep. 64. However, when Crews attempted take-off, the plane began to shudder and vibrate, causing Crews to abort the flight. Id. 64–65. Prichard called Adkins, who informed Prichard that it was common for SkyMasters to shudder in the way that Prichard experienced, and that a pilot could minimize such shuddering by applying back pressure on the yoke. See id. 65–66. Prichard then spoke with Bove, who stated that a wheel imbalance caused the shuddering and that such an imbalance was common on SkyMasters. Id. In subsequent flights, Prichard's pilots took Adkins's advice and the shuddering did not recur. Id.

5

On December 5, 2006, Sorrells flew the plane, with Prichard as a passenger, from the Rowan County Airport to Dallas, Texas, stopping to refuel in Little Rock, Arkansas. Id. 19–20; Def.'s Mem. Supp. Mot. Summ. J., Ex. 6 ("Pl.'s Am. Interr. Ans.") ¶ 7. The following day, Sorrells flew the plane to Little Rock, leaving Prichard in Dallas. See Prichard Dep. 19–20; Pl.'s Am. Interr. Ans. ¶ 7. Before each of these flights, Sorrells performed a walk around inspection of the plane and examined the plane's logbook, as required by FAA regulations. Prichard Dep. 92–93; see 14 C.F.R. § 91.7.

Prichard planned to hangar the plane in Little Rock, where Sorrells lived. Prichard Dep. 19–20. Prichard was to fly to Little Rock on a routine basis in order to receive lessons from Sorrells on flying the twin-engine aircraft. See id. However, Sorrells developed health problems soon thereafter and was unable to provide the lessons. Id. As a result, the plane sat in the Little Rock hangar and was not flown between October 2006 and August 2007. See id.

In June 2007, the plane's airworthiness certificate expired. Id. 96. Prichard then hired John Hurn ("Hurn") to conduct the annual inspection necessary to renew the airworthiness certificate. Id. 96–98; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. C ("Hurn Aff.") ¶ 4. Hurn is a certified A&P and IA and has over thirty years of experience working on Cessna aircraft. Hurn Aff., Ex. 1 ("Hurn Biography"). He is also a licensed pilot and a retired Navy combat pilot and mechanic. Id.

On August 8, 2007, Hurn and another pilot, Don Roney ("Roney"), traveled to Little Rock to retrieve the plane and fly it to Dallas where Hurn was to perform the annual inspection. Prichard Dep. 98; Pl.'s Am. Interr. Ans. ¶ 7; Def.'s Mem. Supp. Mot. Summ. J., Ex. 7 ("Def.'s Hurn Dep.") 59–60.[3] Because the plane's airworthiness certificate had expired, FAA regulations required Hurn

---

[3] Both parties provide excerpts of the same Hurn deposition. But because the parties provide different pages of that deposition, the court will refer to each party's excerpts separately.

to obtain a special "ferry permit" for the flight from Little Rock to Dallas. See 14 C.F.R. §§ 21.197(a)(1), 91.409; Def.'s Hurn Dep. 56–58.[4] Before departing Little Rock, Hurn inspected the plane extensively, checking the oil, brakes, tire pressure, engine, propellers, and various interior spaces where bird nests or debris could build up during a plane's inactivity. Def.'s Hurn Dep. 60–62. Hurn determined that the plane "was in condition for a safe ferry flight . . . ." Id. 62. Prichard Enterprises and Hurn disagree as to whether the FAA actually issued a ferry permit for Hurn's flight from Little Rock to Dallas, or whether Hurn's extensive pre-flight inspection and subsequent conclusion obviated the need for such a permit. Regardless, after completing the inspection, Hurn and Roney flew the plane from Little Rock to Dallas. See Pl.'s Am. Interr. Ans. ¶ 7; Def.'s Hurn Dep. 80–81. Hurn testified that this two-hour flight was "smooth," and that he noticed only minor deficiencies in the plane's rear engine pressure and pressurization during the flight. Def.'s Hurn Dep. 80–82.[5] When he arrived in Dallas, Hurn performed a cursory "post-flight

---

[4] Title 14, Section 21.197 of the Code of Federal Regulations states that

[a] special flight permit may be issued for an aircraft that may not currently meet applicable airworthiness requirements but is capable of safe flight, for the . . . purpose[ of] . . . [f]lying the aircraft to a base where repairs, alterations, or maintenance are to be performed, or to a point of storage.

14 C.F.R. § 21.197(a)(1).

[5] In his deposition, Hurn testified that the aircraft "[f]lew good." Def.'s Hurn Dep. 80. He also stated that he did not recall the altitude or speed that he reached during the flight. Id. 80–81. He characterized the problems that he reported as minor, stating that they were "about the only things that [he] could pick out . . . ." Id. 81. He reported making minimal efforts to diagnose the problems during the flight, and that he "didn't pay much attention to" them. Id. However, in opposing Adkins's motion for summary judgment, Prichard Enterprises submitted an affidavit from Hurn. In the affidavit, Hurn tells a different story. Specifically, Hurn states that he reached 16,000 or 17,000 feet during the flight, causing the rear engine to fail "two or three times." Hurn Aff. ¶ 12. He also states that a faulty turbocharger that could not maintain manifold pressure caused this failure, and that any flight above 12,000 feet would have resulted in the rear engine's failure. Id. ¶¶ 13–14.

Hurn's affidavit conflicts with his deposition testimony. A party cannot avoid summary judgment by submitting a witness affidavit that conflicts with the same witness's prior testimony.

look" at the plane, finding no problems. Id. 82.

Soon thereafter, Hurn began the annual inspection that Prichard had hired him to perform. Id. 82–83. Hurn partially completed the inspection and then emailed Prichard, informing him of numerous mechanical problems that Hurn had encountered up to that point. Id. 83; Def.'s Mem. Supp. Mot. Summ. J., Ex. 8 ("Sept. 15, 2007 Email"); Hurn Aff. ¶¶ 15–16. Hurn states that the defects he noted in this email "needed to be corrected and made the aircraft not airworthy . . . ." Hurn Aff. ¶ 17.[6] In the following days, Hurn sent Prichard several additional emails with photographs and descriptions of the identified problems. Id., Ex. 3. On October 14, 2007, Hurn sent Prichard an invoice for the work that Hurn had performed on the plane up to that point, and for the cost of the necessary repairs. Def.'s Mem. Supp. Mot. Summ. J., Ex. 9 ("Oct. 14, 2007 Email"). The invoice charged $4,549.94 for the needed repairs and charged $3,125 for the annual inspection. Id. In the invoice, Hurn stated that he had already invested $5,500 in the project. Id. Hurn also stated that "only in **[his] opinion**" several of the plane's problems would not have developed "if they had been caught on the [p]re-[b]uy [inspection] or at the last [a]nnual [inspection]." Id. (emphasis in original). Hurn opines in his affidavit that there "is no question that these same problems existed in 2006 and perhaps before that time." Hurn Aff. ¶ 18. According to Hurn, the problems that he

---

See, e.g., Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975–76 (4th Cir. 1990); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984). Thus, the court disregards the portions of Hurn's affidavit that conflict with his deposition testimony.

[6] Among the problems Hurn identified were problems with the front propeller that he states resulted from the removal of the de-icing boot; the absence of a cockpit placard indicating removal of the de-icing boot; a crack in the battery box, which someone had previously failed to repair; acid from the broken battery box leaking onto the heater fuel line; rust and pitting on the rear engine metal tubing mount; a missing control cable from the tanis heater inlet shroud in the front engine compartment, preventing an emergency shut-off; a prop governor cable attached to the engine with safety wire and not properly clamped; several broken ignition leads on the rear engine; a broken support between the rear-engine turbo and the rear engine; and rusted bolts and clamps on the rear engine exhaust. Hurn Aff. ¶ 17.

found in 2007 were not of the type that would have developed during the plane's idleness. Id.

After receiving the October 14, 2007, invoice from Hurn, Prichard paid the amount due and instructed Hurn to discontinue further inspection and repair of the plane. See Prichard Dep. 126; Def.'s Hurn Dep. 83. Based on Hurn's diagnosis, Prichard believes that at the time of sale the plane had not been in the condition that Adkins had warranted. See Prichard Aff. ¶¶ 22–23.[7] On October 24, 2008, Prichard Enterprises sought to rescind the purchase agreement. Id. ¶ 23; Def.'s Mem. Supp. Mot. Summ. J., Ex. 15 ("Oct. 24, 2008 Letter from Prichard to Adkins"). When Prichard instructed Hurn to discontinue the repair and inspection in October 2007, Hurn had removed and not yet reinstalled various parts of the plane. See Def.'s Hurn Dep. 83. Hurn gathered these parts, put them in boxes, and stored the boxes inside the aircraft. Id. Hurn then placed the partially disassembled SkyMaster in a climate-controlled Dallas hangar. See Prichard Aff. ¶ 25; Hurn Aff. ¶ 20. Prichard has since moved the plane to a different climate-controlled hangar in Dallas, but the plane remains in the same disassembled state. Pl.'s Am. Interr. Ans. ¶ 12; Prichard Aff. ¶ 25.

The parties agree that the plane is not presently in airworthy condition. See Prichard Dep. 128; Adkins Dep. 81; Def.'s Hurn Dep. 120; Def.'s Mem. Supp. Mot. Summ. J., Ex. 11 ("2d Hyde Aff.") ¶¶ 4–6; Pl.'s Mem. Opp'n Mot. Summ. J. 3; id., Ex. D ("Bland Aff.") ¶ 5. However, the

_____

[7] In support of Adkins's motion for summary judgment, Adkins's expert, Russell Hyde ("Hyde"), describes the repair work as routine. See Def.'s Mem. Supp. Mot. Dismiss, Ex. 10 ("1st Hyde Aff.") ¶¶ 7, 12. Hyde is a certified A&P and IA and a licensed multi-engine aircraft pilot, who first began working on Cessna SkyMasters over thirty years ago and who has logged approximately 1,400 hours flying SkyMasters. Id. ¶¶ 1–3. Hyde states that "the age and sophistication of Cessna SkyMasters makes them expensive to own and maintain." Id. ¶ 9. He estimates that the average minimum cost of an annual inspection of a SkyMaster is between $3,000 and $5,000, but states that he routinely performs annual inspections that cost plane owners between $6,000 and $7,000. Id. Adkins also testified about SkyMasters' maintenance costs, stating that SkyMasters were expensive to maintain because "[t]hey're a complex aircraft . . . [with] several systems . . . that have a potential for failure." Adkins Dep. 75–76. Adkins stated that he routinely paid between $5,000 and $10,000 to complete an annual inspection of the SkyMasters that he has owned. Id. 76.

parties dispute the costs necessary to bring the plane into airworthy condition. Hurn stated that before storing the plane, he and his fellow mechanics put caps on disconnected wiring, sealed the engine, taped over exposed holes, and cleaned the body of the plane. Def.'s Hurn Dep. 121. He testified that since the aborted inspection in October 2007, the plane has "been well maintained." Id. Prichard and Hurn both claim that the removed parts could be reinstalled at a minor expense and that the plane could be restored to its 2006, time-of-sale condition or, at minimum, the condition that it was in when Hurn began his 2007 work. Prichard Aff. ¶ 28; Hurn Aff. ¶ 21. Adkins's expert, Hyde, inspected the plane on June 28, 2011, and reached a different conclusion. 2d Hyde Aff. ¶ 3. Hyde states that the plane has suffered from non-use and from improper maintenance. Id. ¶¶ 6–14. He describes unaddressed corrosion from the leaked battery acid and rust on the engine mounts, both of which Hurn first discovered in 2007, and both of which have since worsened. Id. ¶¶ 8–11. Hyde also states that, despite Hurn's claims of having covered all of the plane's exposed holes, Hyde discovered various exposed points of entry in the flight instrument panel and the rear engine that have probably become filled with debris and insects. Id. ¶¶ 12–13; id., Exs. A–B (providing photographs of the aircraft taken in June 2011, showing exposed valves and lines). Adkins agreed with Hyde's conclusion that the plane is now beyond repair, stating, "At this point, it's—it's a candidate for—for the salvage yard." Adkins Dep. 81.

Despite the immaterial factual dispute regarding the current condition of the plane, the parties agree that it would be expensive to complete an annual inspection of the plane and bring it to airworthy condition. Prichard Enterprises states that an inspection of the plane would cost approximately $10,000 and needed repairs would cost approximately $140,000. Pl.'s Am. Interr. Ans. ¶ 14. Hurn concurs with this statement, affirming that he would demand that Prichard pay a deposit of $150,000 before Hurn would begin work on the plane. Def.'s Hurn Dep. 120.

10

In its complaint, Prichard Enterprises raises four claims under North Carolina law and seeks punitive damages. Compl. ¶¶ 24–54. First, Prichard Enterprises claims breach of the 2006 aircraft purchase agreement, alleging that Adkins failed to deliver an aircraft in an airworthy condition and refused to accept rescission of the contract. Id. ¶¶ 24–31. For this claim, Prichard Enterprises seeks to recover the costs of bringing the plane to the condition bargained for, or a return of the money that it paid for the plane. Id. ¶ 31. Second, Prichard Enterprises alleges that Adkins breached the warranty that he made to Prichard Enterprises as to the aircraft's being in an airworthy condition at the time of sale, and that Prichard Enterprises detrimentally relied on this warranty, entitling Prichard Enterprises to recover the costs necessary to bring the aircraft to the warranted condition or the difference in value of the aircraft as warranted and as delivered. Id. ¶¶ 32–36. Prichard Enterprises also raises claims of fraud and violations of the North Carolina Unfair or Deceptive Trade Practices Act ("UDTPA") and seeks punitive damages. Id. ¶¶ 37–54. Adkins seeks summary judgment on all of plaintiff's claims. Def.'s Mot. Summ. J. [D.E. 34].

## II.

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 325. After the moving party has met this burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S.

at 248. The court views the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

A.

"Breach of warranty in a sales contract is an affirmative plea, whether as a defense or ground for the recovery of damages, and the burden is on one who asserts it to establish it by the greater weight of the evidence." Garner v. Kearns, 257 N.C. 149, 151, 125 S.E.2d 390, 392 (1962) (per curiam) (quotation omitted); see N.C. Gen. Stat. § 25-2-313(1)(a). Under North Carolina law, the elements of a claim for breach of express warranty in a sales contract are "(1) an express warranty as to a fact or promise relating to the goods, (2) which was relied upon by the plaintiff in making his decision to purchase, (3) and that this express warranty was breached by the defendant." Harbour Point Homeowners' Ass'n, Inc. ex rel. Bd. of Dirs. v. DJF Enters., Inc., 697 S.E.2d 439, 447 (N.C. Ct. App. 2010) (quotation omitted); see Hall v. T.L. Kemp Jewelry, Inc., 71 N.C. App. 101, 104, 322 S.E.2d 7, 10 (1984). To recover damages for a breach, a plaintiff must show that the breach proximately caused the loss sustained. See Rose v. Epley Motor Sales, 288 N.C. 53, 60, 215 S.E.2d 573, 577 (1975); City of Charlotte v. Skidmore, Owings & Merrill, 103 N.C. App. 667, 679, 407 S.E.2d 571, 579 (1991).

In determining whether a seller made an express warranty, courts focus on whether the seller's statements were so regarded by the buyer as part of his reason for purchasing the goods. Pake v. Byrd, 55 N.C. App. 551, 552–53, 286 S.E.2d 588, 589–90 (1982). While a seller need not "use formal words such as 'warrant' or 'guarantee' or . . . have a specific intention to make a warranty, . . . an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." N.C. Gen. Stat. § 25-2-313(2). Moreover, a plaintiff must have relied upon a warrantor's statement in order to

12

establish a breach of an express warranty. Garner, 257 N.C. at 151, 125 S.E.2d at 392; see Pake, 55 N.C. App. at 553, 286 S.E.2d at 590 ("[W]here the buyer relies on his own skill and judgment, thereby essentially disclaiming any warranty, the seller's statements cannot be viewed as the basis of the bargain."). However, "the element of reliance can often be inferred from allegations of mere purchase or use if the natural tendency of the representations made is such as to induce such purchase or use." Bernick v. Jurden, 306 N.C. 435, 448, 293 S.E.2d 405, 413 (1982); see Kinlaw v. Long Mfg. N.C., Inc., 298 N.C. 494, 500 n.7, 259 S.E.2d 552, 557 n.7 (1979). Finally, to establish a breach of an express warranty, a plaintiff must demonstrate that "the defects complained of existed at the time of the sale." Pake, 55 N.C. App. at 554, 286 S.E.2d at 590 ("The seller's warranty is not his personal guarantee concerning the continuous and future operation of the goods which he has sold." (quotation omitted)); see also Bailey v. LeBeau, 79 N.C. App. 345, 350, 339 S.E.2d 460, 463 (1986), aff'd, 318 N.C. 411, 348 S.E.2d 524 (1986).

In support of his summary judgment motion, Adkins concedes that the purchase agreement contains an express warranty. Cf. Def.'s Mem. Supp. Mot. Summ. J. 22–25. The purchase agreement states, inter alia,

> Seller warrants that: (a) the Aircraft is in airworthy condition; (b) the Aircraft has a current annual inspection; (c) the Aircraft has a currently effective Standard Category Airworthiness certificate issued by the Federal Aviation Administration; (d) all of the Aircraft's logbooks are there; (e) flight manual and owners handbook are present.

Purchase Agreement ¶ 6.[8]

---

[8] Plaintiff's complaint states that Adkins warranted that "the [a]ircraft was airworthy at the time of sale." See Compl. ¶ 33. The court construes this statement as a claim that Adkins breached the first express warranty—that the plane is in airworthy condition. See id. Although Prichard Enterprises goes on to allege that the plane did not conform to FAA regulations, these statements do not suggest that Adkins violated the second or third express warranties listed. See id. ¶ 34. Furthermore, Prichard Enterprises does not dispute that, at the time of sale, the plane had a current annual inspection and airworthiness certificate. See Bland Aff., Ex. 2 ("Airworthiness Determination 1").

13

Initially, Adkins argues that summary judgment is appropriate because Prichard Enterprises did not rely on the purchase agreement's express warranty in deciding to purchase the aircraft. Def.'s Mem. Supp. Mot. Summ. J. 22–23. In support, Adkins contends that Prichard Enterprises instead decided to purchase the aircraft in reliance on the pre-purchase inspections that Prichard hired Sorrells and Bove to perform. Id. 23.

The court need not address Adkins's argument concerning reliance. Instead, the court focuses on whether the plane was in "airworthy condition" when sold.

Adkins argues that plaintiff's breach-of-express-warranty claim should be rejected because "the undisputed evidence from the time of sale shows the [a]ircraft was airworthy." Id. 24. In support, Adkins notes that, around the time of the sale, the only mechanical problem that Prichard encountered was "shuddering in the landing gear," which resulted from a wheel imbalance and could be avoided with the proper technique. Id. Moreover, in successive flights after the October 2006 purchase, but before Hurn's October 2007 inspection, pilots of the plane observed no problems, and flew the plane only after standard pre-flight walk around inspections. Id. Adkins notes that Hurn performed a particularly lengthy pre-flight inspection in Little Rock before flying the plane to Dallas in August 2007 and that this inspection revealed no problems. Id. Adkins also cites the testimony of his retained expert, Hyde. In his first affidavit, Hyde states that the majority of the plane's problems that Hurn identified in October 2007 were "routine issues that arise with SkyMaster aircraft." 1st Hyde Aff. ¶ 12. Hyde also opines that the few non-routine problems listed by Hurn did not pertain to FAA-required equipment. Id. ¶ 13. Therefore, the plane was airworthy, so long as its owner properly placarded the faulty equipment. Id.

Prichard Enterprises responds in opposition and argues that it has provided sufficient evidence to demonstrate a genuine issue of material fact as to whether the plane was "in airworthy

14

condition" at the time of sale. Pl.'s Mem. Opp'n Mot. Summ. J. 4–7. It relies on the opinions of Hurn and of its retained expert, Gene Michael Bland ("Bland"). Id. 5.[9] Hurn states in an affidavit that "there is no question that [the problems that he encountered in the October 2007 aborted annual inspection] existed in 2006 and perhaps before that time." Hurn Aff. ¶ 18. Hurn rejects the possibility that the problems might have developed between October 2006 and August 2007 while the plane was hangared in Arkansas. Id. Bland also opines that the aircraft "would not [have been] considered airworthy because it . . . was not in a condition for safe operation on or about 12-06-2006 . . . ." Airworthiness Determination 4. Bland concludes that various mechanical problems as well as Adkins's failure to properly record mechanical alterations in the plane's logbook "made the aircraft unairworthy by regulatory standards [and] also made the aircraft dangerous to fly." Bland Aff. ¶ 6; Airworthiness Determination 4. Bland believes that the problems he noted in June 2011 would have existed in 2006 and were "not problems that would have developed during the time when the aircraft was idle." Bland Aff. ¶ 7.

To determine whether Adkins breached the express warranty at the time of sale, the court must determine the meaning of the warranty's term "airworthy condition." See Purchase Agreement ¶ 6. Under North Carolina law, interpretation of a written and unambiguous contract is a question of law for the court. Briggs v. Am. & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960). When construing contractual terms, a contract's plain language controls. See, e.g., State v. Philip Morris USA Inc., 363 N.C. 623, 631–32, 685 S.E.2d 85, 90–91 (2009); Hodgin v. Brighton, 196 N.C. App. 126, 128–29, 674 S.E.2d 444, 446 (2009); Hemric v. Groce, 169 N.C. App. 69, 76,

---

[9] Bland is an aviation consultant that Prichard Enterprises hired to examine the plane for this litigation. See Bland Aff. ¶¶ 2, 4. Bland is a licensed A&P and IA with over thirty-seven years of aviation experience, during which he has worked as an aviation maintenance instructor, an aviation safety inspector, and as the director of several aviation maintenance shops. Id., Ex. 1 ("Bland Resume").

609 S.E.2d 276, 282 (2005); Martin v. Martin, 26 N.C. App. 506, 508, 216 S.E.2d 456, 457–58 (1975).

Other courts have addressed the term "airworthy condition" in warranty provisions similar to the one at issue in this case. In JDI Holdings, LLC v. Jet Management, Inc., 732 F. Supp. 2d 1205 (N.D. Fla. 2010), the parties executed a 2005 aircraft purchase agreement that "obligated the seller to deliver [a 1984 Cessna Citation Model 650 jet aircraft] in an airworthy condition . . . ." Id. at 1214. The court noted that the parties did not define "airworthy" in the agreement, but held that the word's meaning was "well understood by those in the aircraft industry." Id. at 1213–14 & n.17. The parties agreed that, although different mechanics could "have differing views and opinions on what is and is not airworthy . . . an opinion on airworthiness attests only to the condition of an individual item at that point in time; it could break the next day." Id. at 1214 n.17. In JDI Holdings, plaintiff-buyer subjected the aircraft to an extensive pre-purchase inspection at a designated Cessna service center, where mechanics made various repairs to resolve "airworthy discrepancies." Id. at 1214–20. However, after closing, plaintiff encountered mechanical problems during his initial flights that led his mechanic to identify an additional forty-six items in need of repair. Id. at 1221–22. Plaintiff's mechanic grounded the plane and obtained a ferry permit to transport the plane to a Cessna service center. Id. at 1222. After defendant-seller refused to indemnify plaintiff for the repair costs, plaintiff sued, claiming breach of the purchase agreement's warranty that the plane was "in an airworthy condition." See id. at 1226. Plaintiff sought to establish the breach of warranty by referring to items deferred and not repaired during the pre-purchase inspection. Id. at 1226–27. In granting defendant's Rule 52(c) motion at the close of plaintiff's evidence in a bench trial, the court held that although the contract did not define "airworthy condition" or "specify who would decide whether or not a discrepancy was airworthy if a dispute arose," plaintiff's evidence demonstrated that

16

defendant had "delivered the aircraft in conformance with the contract." Id. at 1227. The court reached this conclusion because none of the deferred items "presented an airworthiness problem" and "no pilots had noted airworthy defects or grounded the plane on [plaintiff's] trips immediately after closing." Id. (noting that the plane was not grounded until a month after closing, and only then by a mechanic and not a pilot).

The Texas Court of Appeals reached a similar conclusion in construing a warranty containing the phrase "airworthy condition" in Tice v. Ron Farish Aircraft, Inc., No. 11-91-293-CV, 1993 WL 13141539, at \*2 (Tex. App. July 22, 1993) (unpublished). In Tice, the parties agreed that the "[a]ircraft [being sold] is to be in airworthy condition with all systems functioning normally . . . ." Id. (emphasis removed). Before closing, plaintiff-buyer paid Johnson Aviation, a third party, to perform the plane's annual inspection, thereby renewing the plane's airworthiness certificate. Id. After the sale, plaintiff flew the plane approximately seven times over the course of a month before the plane's electrical system failed during flight, causing plaintiff to execute an emergency landing. Id. Plaintiff concluded that the plane was no longer in an airworthy condition and sued defendant for breach of warranty. See id. at \*2–3. The Texas Court of Appeals upheld the trial court's grant of a directed verdict for defendant, holding that plaintiff had "failed to offer competent proof that the airplane was not in an 'airworthy condition'" at the time of sale. Id. at \*3. The court based this conclusion on several facts: that plaintiff had taken possession of the aircraft soon after Johnson Aviation had performed an annual inspection; that plaintiff, "an exceptionally well-qualified pilot," thought the plane was in airworthy condition when he took possession of it; and that plaintiff flew more than 2,000 miles in the plane before experiencing any problems with it. Id.

Here, the purchase agreement does not define "airworthy condition." See Purchase Agreement ¶ 6. Absent a definition of a contractual term, the court seeks to give effect to the

17

meaning that the parties intended the term to have at the time of contracting. See, e.g., Lane v. Scarborough, 284 N.C. 407, 409–11, 200 S.E.2d 622, 624–25 (1973). In opposing Adkins's motion for summary judgment, Prichard Enterprises does not expressly state what meaning it attached to the term "airworthy condition" at the time of sale. See Pl.'s Mem. Opp'n Mot. Summ. J. 4–7. Adkins provides his understanding of the term in his reply brief. See Def.'s Reply [D.E. 38] 3 ("[A]irworthy condition is a flight-by-flight determination that evaluates the physical aspects of the aircraft . . . [to determine] an aircraft's safety and ability to undertake a given flight . . . ."). Notably, Adkins's proposed definition comports with the definition of "airworthy condition" provided by Hurn, one of Prichard Enterprises's experts. See Pl.'s Mem. Supp. Mot. Summ. J., Ex. C ("Pl.'s Hurn Dep.") 63–64 ("[Airworthy condition] means that [an aircraft] would be—mechanically, electrically and structurally conditions occur for that given date and time for the trip that we're going to be taking . . . . [An aircraft] may be in an un-airworthy condition because of the paperwork, has not had its latest inspection, but it mechanically or electrically or structurally would be safe for a flight.").

Although not explicitly referenced in the purchase agreement, FAA regulations dealing with airworthiness are instructive. As noted, 14 C.F.R. § 91.7 states that "[n]o person may operate a civil aircraft unless it is in an airworthy condition," and goes on to state that "[t]he pilot in command of a civil aircraft is responsible for determining whether that aircraft is in condition for a safe flight." 14 C.F.R. § 91.7(a)–(b). The FAA regulation does not explicitly define "airworthy condition." However, it prohibits flying an aircraft that is not in an airworthy condition. Moreover, the FAA regulation requires a pilot to make a flight-by-flight evaluation of an aircraft's "airworthy condition" to determine whether an aircraft may be safely operated during an immediate flight. See id.; cf. Holbrook v. United States, No. 10-2355, 2012 WL 764471, at *7 (4th Cir. Mar. 12, 2012). This definition comports with those that Adkins and Hurn provide, and the definitions that the courts in

18

JDI Holdings and Tice adopted. Accordingly, the court concludes that the parties intended "airworthy condition" to be construed consistently with this generally accepted definition. Thus, Adkins warranted only that, at the time of sale, the plane was in a condition such that it could be safely operated during an immediate flight.

With this definition in mind, Prichard Enterprises has failed to raise a genuine issue of material fact regarding whether the plane was "in airworthy condition" at the time of sale. Indeed, the evidence shows that the plane was in "airworthy condition" at the time of the sale. First, although plaintiff's pre-purchase examination of the plane obviously was not as exhaustive as plaintiff or Prichard would have liked in hindsight, the fact remains that Prichard Enterprises hired two individuals to inspect the plane immediately before the sale, neither of whom reported defects that called into question whether the plane was in an "airworthy condition." As noted in Tice and JDI Holdings, an adequate pre-purchase inspection that reveals no defects strongly suggests that an aircraft was in an "airworthy condition" at the time of sale. See JDI Holdings, 732 F. Supp. 2d at 1226–27; Tice, 1993 WL 13141539, at *2–3.

Second, the plane made at least four flights shortly after the sale and before Hurn discovered any defects in October 2007. Opposing this conclusion, Prichard Enterprises notes the shuddering that occurred during the 2006 attempted test flight at the Rowan County Airport, and the turbocharger problems that Hurn experienced during the August 2007 flight from Little Rock to Dallas. Pl.'s Mem. Opp'n Mot. Summ. J. 5–6. Prichard Enterprises then argues that these problems support its position that the plane was not in an airworthy condition at the time of sale. See id. However, Hurn's deposition testimony regarding the August 2007 flight shows that despite these problems, the plane was in "airworthy condition." See Tice, 1993 WL 13141539, at *3 (holding that plaintiff's ability to safely fly the aircraft at issue seven times before experiencing difficulties

19

indicated that the plane was airworthy at the time of sale). Furthermore, Prichard admitted that the shuddering that he, Crews, and Sorrells felt in October 2006 did not recur when the pilot applied back pressure on the yoke. See Prichard Dep. 65–68.

Third, plaintiff's evidence fails to demonstrate that the defects that Hurn identified in October 2007 were sufficiently severe to cause the plane to not be in an "airworthy condition" at the time of sale. The estimate to complete the inspection that Hurn provided Prichard in October 2007 is consistent with the routine maintenance costs that Adkins and his expert described for similar aircraft. Adkins Dep. 76–78; 1st Hyde Aff. ¶ 9. Although the estimate appears to have been provided in anticipation of additional repairs, plaintiff has not proven the existence of any additional defects. Moreover, nothing suggests that the defects discovered, or those that were likely to be discovered, were abnormal for a forty-five year old plane that was months overdue for its annual inspection. See JDI Holdings, 732 F. Supp. 2d at 1226–27; 1st Hyde Aff. ¶ 12.

Finally, even if the defects Hurn allegedly discovered in October 2007 affected whether the plane was in an "airworthy condition" in 2007, the record lacks probative evidence from which a rational jury could find that the plane was not in an "airworthy condition" at the time of the October 2006 sale. Plaintiff provides only Bland's and Hurn's conclusory statements that the defects discovered were not of the type that would have arisen during the plane's period of idleness from August 2007 to date. See Hurn Aff. ¶¶ 18–19; Bland Aff. ¶ 7; cf. Matthiesen v. Banc One Mortg. Corp., 173 F.3d 1242, 1247 (10th Cir. 1999) ("[T]he testimony of an expert can be rejected on summary judgment if it is conclusory and thus fails to raise a genuine issue of material fact."); M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 165 (4th Cir. 1992) (en banc) ("An expert's affidavit that is wholly conclusory and devoid of reasoning does not comply with Fed. R. Civ. P. 56(e)."); Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("[A]

party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations."); Adkins Dep. 79–81; 1st Hyde Aff. ¶ 14. However, Hurn's affidavit contradicts his deposition testimony that the plane "was in a safe operational condition" during the August 2007 flight from Little Rock to Dallas. See Pl.'s Hurn Dep. 142–43. Thus, the court disregards it. See Rohrbough, 916 F.2d at 975–76; Barwick, 736 F.2d at 960. Moreover, Bland reached his conclusion almost five years after the sale, after the plane had been partially disassembled, and after the plane had been idle for five years. Bland Aff. ¶ 4; Airworthiness Determination. Despite Bland's credentials, his conclusion relies on conjecture, and fails to create a genuine issue of material fact. See Anderson, 477 U.S. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.").

In sum, after considering the evidence in the light most favorable to Prichard Enterprises, there is not a genuine issue of material fact as to whether the plane was in "airworthy condition" when Adkins sold it to Prichard Enterprises in October 2006. It was. Thus, Adkins is entitled to summary judgment as to Prichard Enterprises's breach of warranty claim in counts one and two.

B.

Next, the court addresses plaintiff's rescission claim under North Carolina's version of Article 2 of the Uniform Commercial Code ("UCC"). See Ace, Inc. v. Maynard, 108 N.C. App. 241, 246, 423 S.E.2d 504, 507 (1992) ("The sale of [an] airplane constitutes the sale of goods and is thus governed by Article 2 of the Uniform Commercial Code (UCC)."). Under the UCC, the common law doctrine of rescission is equivalent to "revocation of acceptance." Riley v. Ken Wilson Ford, Inc., 109 N.C. App. 163, 173, 426 S.E.2d 717, 724 (1993) ("Rescission of a contract is not addressed

21

in the Uniform Commercial Code, but it has been treated as revocation of acceptance in the context of a sale of goods.").

The UCC states that a "buyer may revoke his acceptance of a . . . commercial unit whose nonconformity substantially impairs its value to him if he has accepted it . . . without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." N.C. Gen. Stat. § 25-2-608(1). However, the UCC conditions the buyer's right of revocation on his exercising it "within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects." Id. § 25-2-608(2).

Adkins argues that Prichard Enterprises did not demand revocation within a reasonable time after its October 2007 discovery of the alleged defects. See Def.'s Mem. Supp. Mot. Summ. J. 18–21. Adkins notes that Prichard Enterprises waited approximately one year after discovering the alleged defects before demanding revocation and argues that this one-year delay was unreasonable. Id.; see Oct. 24, 2008 letter from Prichard to Adkins.

"[W]here the facts are undisputed and only one inference can be drawn therefrom, the question of reasonableness is a question of law properly left to the court." Bus. Commc'ns, Inc. v. KI Networks, Inc., 157 N.C. App. 710, 714, 580 S.E.2d 77, 79 (2003). "In determining whether revocation was made within a reasonable time . . . it is proper to consider all the surrounding circumstances, including the nature of the defect, the complexity of the goods involved, the sophistication of the buyer, and the difficulty of [the defect's] discovery." Harrington Mfg. Co., Inc. v. Logan Tontz Co., 40 N.C. App. 496, 503, 253 S.E.2d 282, 286 (1979). In Business Communications, the North Carolina Court of Appeals held that defendant's six-month delay in informing plaintiff of defendant's revocation after discovering the good's defective nature was

unreasonable as a matter of law. Bus. Commc'ns, 157 N.C. App. at 714–15, 580 S.E.2d at 79–80. The North Carolina Court of Appeals reached similar conclusions concerning five-month and seventeen-month delays. See ITT-Indus. Credit Co. v. Milo Concrete Co., Inc., 31 N.C. App. 450, 461, 229 S.E.2d 814, 822 (1976) (holding that a buyer of a concrete pump could not revoke his acceptance of the pump after retaining it for five months because the buyer "had ample time to effectively reject the goods, particularly since the pump's defects were observed at the beginning of its operation"); Cooper v. Mason, 14 N.C. App. 472, 474, 188 S.E.2d 653, 655 (1972) ("It would seem that seventeen months and 30,000 miles [of post-defect-discovery use of an automobile] exceed a reasonable time for revocation of the purchase of the automobile under the most liberal interpretations of [reasonable].") (emphasis removed).

Here, Plaintiff's actions and statements in October 2007 indicate that it considered the alleged defects to be of a severe enough character to warrant revocation of acceptance, yet plaintiff failed to act for approximately one year. Even viewing the record in the light most favorable to plaintiff, plaintiff's one-year delay in notifying Adkins of the alleged defects and demanding revocation of the purchase was not reasonable. See Bus. Commc'ns, 157 N.C. App. at 714, 580 S.E.2d at 79; ITT-Indus. Credit, 31 N.C. App. at 461, 229 S.E.2d at 822; Cooper, 14 N.C. App. at 474, 188 S.E.2d at 655.

In opposition to this conclusion, Prichard Enterprises claims that it was unaware of its legal rights, and laments that it initially hired an inexperienced attorney to review the matter. These excuses provide no comfort to plaintiff. Likewise, Prichard's need to manage his deceased mother's estate does not absolve Prichard Enterprises of its duty to act reasonably. Accordingly, Prichard Enterprises has failed to demonstrate that a genuine issue of material fact exists regarding its claim for contract rescission and the court grants summary judgment to Adkins on that claim.

23

Finally, Prichard Enterprises has presented insufficient evidence to support its fraud or UDTPA claims. Merely asserting a fraud or UDTPA claim cannot transform this breach of warranty case into a fraud or UDTPA case. See, e.g., Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998); PCS Phosphate Co., Inc. v. Norfolk S. Corp., 520 F. Supp. 2d 705, 717–18 (E.D.N.C. 2007), aff'd, 559 F.3d 212 (4th Cir. 2009). Thus, the court grants summary judgment to Adkins on these claims.

III.

In sum, the court GRANTS defendant's motion for summary judgment [D.E. 34]. The Clerk of Court shall close the case.

SO ORDERED. This 14 day of March 2012.

JAMES C. DEVER III
Chief United States District Judge